**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **ECONOMY FOLDING BOX CORP.,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No.     04 CV 4485** |
| | ) | **Judge Blanche M. Manning** |
| **ANCHOR FROZEN FOODS, CORP.** | ) | |
| **Defendant.** | ) | |

## MEMORANDUM AND ORDER

Plaintiff Economy Folding Box Corporation ("Economy") brought suit against Anchor Frozen Foods, Corporation ("Anchor") for breach of contract after Anchor failed to pay for special order shipping boxes it ordered from Economy.  Economy now seeks full payment under the sales agreement as well as interest and storage costs.  Anchor has filed an affirmative defense asserting a breach of the implied warranties of merchantability and fitness for a particular purpose.

A bench trial was conducted on July 10 and 11, 2006, and the parties have submitted their proposals for findings of fact and conclusions of law.  In accordance with Fed. R. Civ. P. 52(a), the court makes the following Findings of Fact ("Findings") and Conclusions of Law ("Conclusions").  To the extent any of the Findings reflect legal conclusions, they shall be deemed Conclusions and vice versa.

The court also notes that the parties' briefs and proposed Findings and Conclusions are lacking in completeness and clarity.  On at least one occasion, Economy's proposed Conclusions mention an argument (specifically, the alleged failure to allow cure) that is not discussed in its

post-trial brief. Moreover, both parties throw out propositions of law with little to no analysis tying those propositions to the facts of this case. Finally, after both parties present what could at best be charitably described as very convoluted summaries of expert testimony, Anchor effectively abandons any effort to present a meaningful argument based on this testimony stating in its post-trial brief that "[n]o attempt will be made here to simplify the very technical procedures and calculations that each [of the experts] included in their reports and live testimony, or to distinguish the subtleties of their methodologies." Resp. at 10. Instead, apparently, that job will be left to the court, at least in Anchor's view.

The court, as factfinder, assesses the credibility of the two primary fact witnesses, Roy Tucillo, Anchor's president, and Ken Green, Economy's salesperson for the transaction at issue. It finds that Roy Tucillo was a credible witness while Ken Green was not. The court bases its finding on personally hearing the testimony of each of these witnesses and perceiving the demeanor of each while testifying, including, respectively, their body language, the inflection in their voices and the specificity of the details provided by each witness. *United States v. Ray*, 238 F.3d 828, 834 (7th Cir. 2001) ("we reverse [credibility] determinations on appeal only under exceptional circumstances, such as 'where it was physically impossible for the witness to observe that which he claims occurred, or impossible under the laws of nature for the occurrence to have taken place at all.' ")(quoting *United States v. Williams*, 216 F.3d 611, 614 (7th Cir. 2000)).

## I.  Findings of Fact

A.  *Parties and their relationship*

    1.  Economy was and is at all relevant times an Illinois corporation organized and licensed to do business in Illinois. Its principal place of business is Chicago, Illinois. Anchor was and is at all relevant times a New York corporation with its

principal place of business in Westbury New York.

2.     Economy has been engaged in the business of selling packaging materials and manufacturing boxes for at least 52 years. It makes custom boxes to the specifications of the customer.

3.     Anchor has been engaged in business in the wholesale frozen seafood industry for 26 years. Anchor sold seafood under the name Prince of the Sea.

4.     At all relevant times, Roy Tucillo was the sole principal and president of Anchor and was routinely and substantially involved in the ordering of boxes from Anchor.

5.     At all relevant times, Ken Green was employed by Economy as a sales representative. He has been in the box business uninterrupted for 36 years.[1]

6.     Green and Tucillo met about ten or eleven years prior to the dispute at issue and during that time enjoyed a very good business relationship.

7.     Anchor regularly ordered cartons from Economy for the purpose of packaging Anchor's frozen seafood. Prior to the transaction at issue, the cartons that Anchor bought from Economy were interior product cartons as opposed to exterior shipping cartons.

B.     *Transaction at issue*

8.     Prior to the transaction at issue, Economy had provided to Anchor boxes in which it packaged its seafood. These boxes were then displayed by the supermarket in their freezer sections.

9.     These boxes were not the ones in which Anchor would ship the product to its brokers. The shipping boxes ("shippers") Anchor had used prior to the transaction at issue were basic white corrugated boxes which were not supplied by Economy.

10.    Because the end consumer did not see the shippers, a basic white box was the most cost efficient manner in which to ship the seafood packages.

11.    However, in late 2003, Anchor embarked an a new venture whereby it would package and sell "six-packs" of frozen seafood to distributors for resale to end-

---

[1]At times, the court will refer to Tucillo or Green specifically where necessary, while at other times it will refer only to Anchor or Economy for ease of reference.

user customers. These six-packs would include six different inner packages of Prince of the Sea (i.e., Anchor brand) frozen seafood within a single outer box.

12.    Because the consumers would see the outer box, Anchor envisioned using graphics on the outer box under this new venture. Pursuant to the new venture, Anchor had been using rudimentary graphics on a corrugated brown shipper. However, this shipper was not "eye-appealing."

13.    In or around January 2004, Tuccillo told Green about the new frozen seafood six-pack concept and that he wanted an outer box that was very "eye-appealing" to the consumer. Tuccillo thought Economy did a very good job with graphics.

14.    This meeting took place in Anchor's conference room in New York. Tuccillo provided Economy with the specifications and rough graphics for the cartons ordered.

15.    Tuccillo told Green that the outer "master" carton would be the shipping box and that they would be palletized and would "lay as a seven" and "go nine high" for a total of 63 on a 48-inch pallet so as to fit in the 110-inch opening of a trailer. Tuccillo also told Green that the pallets would then be shipped out on freezer trucks to distributors for eventual sale to consumers. Tr. 161-164.

16.    Green acknowledged that Tuccillo told him that the boxes would be palletized "and that he [Tuccillo] would be sending them out through his distributors." Green also testified that he knew the items to be shipped would be frozen. He also represented to Tuccillo that the board used in the box was "freezer-worthy." [2]

17.    This project was the first time that Economy had provided an "outer" or "shipper" box to Anchor.

18.    Economy prepared some designs for the size and shape of the inner and outer six-pack boxes. Tuccillo supplied his own graphic design.

19.    Anchor specified that it needed one large outer carton which would contain six smaller cartons filled with frozen seafood product.

20.    Tuccillo told Green he wanted the master carton to open on top so that the six inner cartons could be pulled out.

---

[2]According to Green, he asked Tucillo if a moisture-barrier was necessary, "either a poly or a wax," and Tuccillo said no because the items would be frozen in bags. However, the court found Green not to a credible witness and accepts Tuccillo's testimony that the paper board carton would be "good."

21. The discussion between Economy and Anchor dealt with the configuration of the boxes. Green specified a paper board material for the outer cartons and stated that these cartons would be strong enough to hold the six inner boxes.

22. Green was aware that Tucillo had considered a laminated corrugated outer carton but told him that it would be very expensive. Tucillo testified that he did not question Green's advice because Green was in the box business. Tucillo relied on Green's advice that the outer paper board carton was "going to be good." Tr. 227.

23. Anchor received, pursuant to the policies and procedures of Economy, sample boxes for its approval.

24. A sample has a place for the customer to sign and denote its approval of the sample.

25. After further discussion and design, Economy eventually sent a sample of a plan for inner and outer carton configuration and Anchor approved the sample.

26. Tuccillo tested the sample boxes prior to approving them by filling the inner cartons with Anchor's product, placing the inner carton in the outer carton and freezing the fully loaded cartons for a week.

27. Anchor approved for manufacture and delivery by signing the actual sample cartons used in testing and returned its approval to Economy for manufacturing of the cartons.

28. Anchor specifically asked Economy if the board was freezer-worthy. Economy stated that it was and informed Anchor that it could provide correspondence from the board manufacturer declaring the board's freezer-worthiness.

29. Anchor expressed a concern with regard to the freezer-worthiness of the cartons.

30. On or about March 8, 2004, Anchor ordered from Economy approximately 180,000 inner cartons and 30,000 outer cartons to be increased or increased up to 20% based upon actual overrun or underrun of cartons by Economy. The order was based on a quotation provided by Economy to Anchor. Plaintiff's Trial Exhibit 4 is a true and correct copy of the executed quotation and contains the terms and conditions applicable to the transaction at issue.

31. The Quotation agreed to by Anchor contained the terms of the agreement between the parties and specified that Illinois was to be the forum for all disputes and that Illinois law was to apply to any disputes.

32. The first shipment of cartons pursuant to the quotation was comprised of 6,300 outer cartons and 36,800 inner cartons. These were accepted without qualification by Anchor.

33. On or about April 14, 2004, Economy issued invoice no. 431640 for $78,458.40. This first invoice was for 204,000 inner cartons at the agreed price of $.2461 per inner carton for a total inner carton cost of $50,612,40, and for 34,000 outer cartons invoiced at an agreed price of $.819 per outer carton for a total outer carton cost of $27,846.00 for the first invoice.

34. On or about April 27, 2004, Economy issued a second invoice no. 431690 for $4,615.20. This invoice covered an additional 12,000 inner cartons that had been produced at a price of $.2481 per inner carton for a total inner carton cost of $2,977.20, and an additional 2,000 outer cartons that had been produced and invoiced at a price of $.819 per outer carton for a total outer carton price for that invoice of $1,638.00.

35. The total amount claimed to be due and owing to Economy from Anchor as of April 27, 2004, pursuant to the quotation was $83,073.60.

C. *Anchor experiences problems with the boxes and notifies Economy*

36. Anchor placed the boxes in its warehouse and subsequently sent out orders to two of its customers, Colorado Choice Distributors and American Gold Label, which are brokers.

37. Anchor did not ship directly to Colorado Choice Distributors or American Gold Label, but to various cold storage facilities at the direction of those customers. Colorado Choice Distributors and American Gold Label would then sell to their own customers from those locations.

38. The boxes were in good shape when they left Anchor's warehouse.

39. The delivery time from Anchor to its customers was estimated to be five or six days.

40. About two or two and a half weeks after shipping the first order, Tucillo received a call from Jay Raulerson at Colorado Choice complaining of a problem with the outer boxes splitting open and crushing at one of the cold storage facilities.

41. Raulerson directed Tucillo not to send any more of those boxes.

42. Within the next couple of days, Raulerson told Tucillo that Raulerson was getting

calls from other locations with the same problem.

43. Tucillo called Economy about the reported problem but did not think Economy believed him so he asked Raulerson to put the complaints in writing.

44. Raulerson sent Tucillo a letter dated May 27, 2004, which Tucillo received on June 3, 2004, and which stated in part that the "new boxes" "look nice" but both of the locations to which he had shipped the boxes complained that the boxes were "just falling apart." Raulerson instructed Tucillo not to send any more of those boxes.

45. On June 8, 2004, Anchor recieved a memo by facsimile from Jeri Parrish at American Gold Label which stated that it "had several complaints from customers about the seafood boxes falling apart."

46. Tucillo forwarded both letters to Economy.

47. On or about May 28, 2004, Economy requested of Anchor to make payment upon invoice nos. 431640 and 431690.

48. On or about May 28, 2004, Anchor sent Economy a written rejection of the boxes.

49. While Tucillo claims he subsequently tried to work with Economy to fix the problem, he testified that Economy rebuffed the efforts and simply demanded payment.[3]

50. Economy filed its lawsuit against Anchor on July 7, 2004.

51. The cartons that were manufactured and not shipped remain in Economy's warehouse. Economy asserts that it has performed all conditions precedent necessary to receiving payment and that it has repeatedly sought payment to no avail.

52. The Quotation includes provisions for interest and storage costs to be accrued on Economy's behalf.

53. As of July 11, 2006, Economy was seeking payment on the boxes of $83,073.60; interest of $36,835.00; storage costs of $24,485.00; interest on the storage costs of

---

[3]Economy presented testimony from its employees that it attempted to investigate the possibility of an alleged problem with the cartons and asked to see the damaged cartons. Tucillo testified that he was unable to present Economy with the damaged boxes until he received them back from his distributors, whcih he was trying to accomplish.

$4,207.00 as well as unspecified legal fees pursuant to the terms of the Quotation.

D.    *Expert testimony*[4]

54.    Economy offered the expert testimony and written report of Stephen C. Powell, Laboratory Director, Container-Quinn Testing Laboratories, Inc., in Wheeling, Illinois.

55.    Powell performed strength and strength factor testing upon the cartons at issue relating to their use for shipping, storage and stackability.

56.    Powell ran ten tests, five at ambient test conditions and five at minus 18 degrees celsius.

57.    The test that was performed was a top-to-bottom compression strength test on the cartons.

58.    A "safety factor" is incorporated into compression testing to account for external factors.

59.    For standard compression testing, Powell utilized a 4 1/2 to 1 safety factor, which is an assurance level 2 in ASTM D-4169, which is the average assurance level within testing parameters.  Further, a safety factor of 4 1/2 to 1 is the standard safety factor that is utilized in ASTM-D-4169.

60.    Powell always uses an ASTM average safety factor of 4 1/2 to 1 for standard compression testing.

61.    In accord with ISTA testing procedures, Powell performed a compression test on an assembled sample of the six-pack boxes.  The sample boxes were empty for this compression test.

62.    Powell concluded based on his testing in frozen temperatures (-18 degrees celsius) that the safe stacking height was 9 boxes high.

63.    In accord with ISTA testing procedures, Cotaj performed a vibratio test, a free fall test, and a dynamic compression test on an assembled sample of the six-pack boxes.  The sample was packed with frozen seafood.

64.    Anchor offered the expert testimony and written report of Anton Cotaj,

_____

[4]As to the experts, the court has included only those facts as stipulated by the parties given that the expert testimony was not necessary to the resolution of the issues.

Laboratory Manager and Project Engineer, Container Testing Laboratory, Inc. of Mamaroneck, New York.

65.    Cotaj opined that the safe stacking height for the boxes was 5 boxes high.

## II.    Conclusions of Law

A.    *Jurisdiction and choice of law*

66.    This court has jurisdiction pursuant to 28 U.S.C. § 1331 and the parties agree that Illinois law applies to this case.

B.    *Acceptance of goods*

67.    In Illinois, the sale of goods is governed by article 2 of the Uniform Commercial Code (UCC). 810 ILCS 5/1-101 et seq.  Moreover, the contract between the parties, Economy's Quote No. 04-7710, provides that the parties have "all the remedies afforded each by the Illinois Uniform Commercial Code."

68.    Under the UCC, a buyer may reject goods that "fail in any respect to conform to the contract." 810 ILCS 5/2-601. The rejection of goods must occur within a reasonable time after delivery, and the rejection "is ineffective unless the buyer seasonably notifies the seller." 810 ILCS 5/2-602 (West 1994). Where a buyer does not validly reject goods, the goods are deemed to have been accepted. 810 ILCS 5/2-606(b) (West 1994).  Here, Anchor does not dispute that it accepted the goods; rather, it argues that it properly revoked acceptance under 810 ILCS § 5/2-608.

69.    As such, Economy had a right to payment for its shipment of the containers.  810 ILCS § 5/2-607, Comment 1 ("Under subsection (1) [of 810 ILCS § 5/2-607], once the buyer accepts a tender the seller acquires a right to its price on the contract terms.").  Moreover, "[u]nder subsection (2) acceptance of goods precludes their subsequent rejection [and] [a]ny return of the goods thereafter must be made by way of revocation of acceptance under the next section." 810 ILCS § 5/2-607, Comment 2.[5]

---

[5]Under 810 ILCS § 5/2-606:
(1) Acceptance of goods occurs when the buyer:
    (a) after a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their non-conformity; or
    (b) fails to make an effective rejection (subsection (1) of Section 2-602), but such acceptance does not occur until the buyer has had

C.    *Revocation of Acceptance*

70.    Anchor claims that it properly revoked acceptance based on § 5/2-608(1)(b)(emphasis added), which provides in relevant part:

> (1) The buyer may revoke his acceptance of a lot or commercial unit whose non-conformity substantially impairs its value to him if he has accepted it:
> (a) on the reasonable assumption that its non-conformity would be cured and it has not been seasonably cured; or
> (b) *without discovery of such non-conformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.*

71.    According to Anchor, its revocation is based on its affirmative defenses of a breach of implied warranty of merchantability and breach of an implied warranty

---

a reasonable opportunity to inspect them; or
(c) does any act inconsistent with the seller's ownership; but if such act is wrongful as against the seller it is an acceptance only if ratified by him.
(2) Acceptance of a part of any commercial unit is acceptance of that entire unit.

Under 810 ILCS 5/2-607:
(1) The buyer must pay at the contract rate for any goods accepted.
(2) Acceptance of goods by the buyer precludes rejection of the goods accepted and if made with knowledge of a non-conformity cannot be revoked because of it unless the acceptance was on the reasonable assumption that the non-conformity would be seasonably cured but acceptance does not of itself impair any other remedy provided by this Article for non-conformity.
(3) Where a tender has been accepted
(a) the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy; and
(b) if the claim is one for infringement or the like (subsection (3) of Section 2-312) and the buyer is sued as a result of such a breach he must so notify the seller within a reasonable time after he receives notice of the litigation or be barred from any remedy over for liability established by the litigation.
(4) The burden is on the buyer to establish any breach with respect to the goods accepted.

of fitness for a particular purpose.[6]

72.     Section 2-314 of the Illinois Commercial Code provides that every sale of goods by a merchant includes an implied warranty that the goods are fit for the ordinary purposes for which they are used unless the warranty is modified or excluded.[7] Section 2-315 of the Code states that a sale of goods also includes an implied warranty of fitness for a particular purpose if a seller knows of the buyer's particular purpose for the goods and the buyer relies upon the seller's skill or judgment to select suitable goods.[8]

---

[6]As each side notes, Anchor failed to make any such counterclaim but did affirmatively assert these defenses in paragraph 18 of its Answer. Implied warranties may be pled as an affirmative defense. *Comark Merchandising, Inc. v. Highland Group*, 932 F.2d 1196, 1203 (7th Cir. 1991)("In Illinois, the affirmative defense of breach of implied warranty 'must be pleaded and proved by a preponderance of the evidence by the party relying on it.'")(*quoting Abatron, Inc. v. Fulton Contracting Co.*, 530 N.E.2d 76, 81 (1988)).

[7]§ 2-314. Implied Warranty; Merchantability; Usage of Trade. (1) Unless excluded or modified (Section 2-316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. Under this Section the serving for value of food or drink to be consumed either on the premises or elsewhere is a sale.

(2) Goods to be merchantable must be at least such as

(a) pass without objection in the trade under the contract description; and
(b) in the case of fungible goods, are of fair average quality within the description; and
(c) are fit for the ordinary purposes for which such goods are used; and
(d) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and
(e) are adequately contained, packaged, and labeled as the agreement may require; and
(f) conform to the promises or affirmations of fact made on the container or label if any.

(3) Unless excluded or modified (Section 2-316) other implied warranties may arise from course of dealing or usage of trade.

[8]§ 2-315. Implied Warranty: Fitness for Particular Purpose. Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose.

73.    A breach of the implied warranty of merchantability or fitness for a particular purpose would give rise to a right to revoke acceptance of goods, but the breach must "substantially impair" the value of the goods.  *Stamm v. Wilder Travel Trailers*, 358 N.E.2d 382, 385 (Ill. App. Ct. 1976)(merchantability); *Lathrop v. Tyrell*, 471 N.E.2d 1049, 1051 (Ill. App. Ct. 1984)(fitness for a particular purpose).

Exclusion of Implied Warranties Based on Examination

74.    However, section 2-316 of the Code, relied upon by Economy, states that no implied warranties apply when "the buyer before entering into the contract has examined the goods or the sample or model as fully as he desired or has refused to examine the goods there is no implied warranty with regard to defects which an examination ought in the circumstances to have revealed to him."  810 ILCS 5/2-316(3)(b). [9]

75.    Economy argues that Anchor had the opportunity to inspect the goods and thus, any implied warranties are excluded.  Tucillo testified that Economy sent him samples and asked him to "look at and approve those samples."  Tr. at 149.  Tucillo stated that he constructed the box, and made sure that all six inner boxes fit properly into the outer box.  Tucillo then tested the filled box by putting it into the freezer for a week.  After testing it in this way, Tucillo had his assistant approve the sample and he signed the quotation provided by Economy.

76.    Indeed, Richard Bartle, controller for Economy, testified that a sample must be approved prior to Economy releasing an order for pricing, production and invoicing.  Tr. at 15.  Thus, Economy argues that because Anchor had the opportunity to fully examine a sample box as fully as it desired, the implied warranties do not apply.

77.    However, Anchor responds that it could not have discovered the defect upon examination.  Indeed, the Official Comment 6 to 5/2-316(3)(b) states that "an examination under circumstances which do not permit chemical or other testing of the goods would not exclude defects which could be ascertained only by such

_____

[9]§2-316.  Exclusion or modification of warranties.
     . . .
(b) when the buyer before entering into the contract has examined the goods or the sample or model as fully as he desired or has refused to examine the goods there is no implied warranty with regard to defects which an examination ought in the circumstances to have revealed to him;
     . . .

testing," and "[n]or can latent defects be excluded by a simple examination."

78.     Here, Anchor received only one sample box, Tucillo filled it and tested it in the freezer for a week and determined it was satisfactory. The parties agree that the boxes were in good shape when they left Anchor's warehouse. There is no evidence that Tucillo could have ascertained any problem with the boxes by the testing that he was able to perform with one box. As such, the fact that Anchor examined the goods does not waive its implied warranties.

79.     Economy's citation to *Trans-Aire International, Inc. v. Northern Adhesive Co., Inc.*, 882 F.2d 1254, 1259 (7th Cir. 1989), does not persuade the court otherwise. In *Trans-Aire*, the plaintiff purchased adhesive from the defendant for use in its conversion of vans to recreational vehicles. However, as with a prior adhesive that Trans-Aire had purchased from another company, the adhesive provided by Northern did not hold when the heat rose in the RVs; thus, Trans-Aire had to repair over 500 of the RVs. Trans-Aire sued Northern for breach of warranty and contract claims, among others.

80.     The district court granted Northern's motion for summary judgment on the ground that no implied warranty of fitness for a particular purpose existed because "Trans-Aire did not rely upon Northern's skill or judgment to select an adhesive." *Id*. at 1257. Moreover, the district court found that any implied warranties had been excluded under § 2-316 by virtue of the fact that Trans-Aire had examined the adhesive as fully as it desired and "refused to conduct further tests which would have confirmed a characteristic of contact adhesives which they already knew to be true, that they soften with heat." *Id*. at 1259.

81.     The Seventh Circuit affirmed noting that Trans-Aire's chief engineer testified that Trans-Aire had experienced problems with an adhesive provided by another company and so contacted Northern for a replacement. However, instead of testing the adhesive on the same summer-like conditions under which the prior adhesive had failed, the engineer tested the Northern adhesive in cool conditions and found them to be adequate. When the engineer suggested to Trans-Aire's president that the adhesive be tested under warmer conditions, Trans-Aire's president indicated that such testing was unnecessary. Thus, the Seventh Circuit concluded that Trans-Aire had excluded the implied warranties under § 2-316.

82.     The Seventh Circuit also rejected Trans-Aire's argument that Trans-Aire could not have discovered the problem with the adhesive as it was a latent defect. Trans-Aire offered no evidence as to why the heat testing, which its engineer suggested would be wise to pursue, could not be conducted. The only evidence as to why those tests were not performed was that the president stated that such tests were unnecessary. The Seventh Circuit noted that a "professional buyer examining a

product in his field will be held to have assumed the risk as to all defects which a professional in the field ought to observe." *Id.* at 1259 (citation and internal quotation marks omitted). It went on to note that "Trans-Aire clearly knew that contact adhesives generally soften with heat; in addition to [the engineer's] general observations, it is undisputed that Trans-Aire had experienced problems with another adhesive which its admits . . . was a 'match' for [the previous adhesive]." *Id*. Thus, the court found that Trans-Aire had evinced an intent to waive its implied warranties.

83.    Here, however, Tucillo, Anchor's president, stated that he described to Economy what he needed. Indeed, Economy, in its reply brief states:

> As part of the ordering process and design of the cartons, Anchor indicated to Economy's salesman, [sic] that the cartons would be used primarly for route sales of frozen seafood. Additionally, Anchor wanted to sell to retail stores and other avenues of sales and ultimately, these cartons would wind up in the hands of consumers. In order to achieve that sales model it is apparent that the fully packed cartons would pass through many persons or entities to a consumer.

84.    Economy Reply at 9. Thus, Economy acknowledges that it was aware how the boxes were to be packed and shipped. Tucillo tested the one sample box he received to make sure that the inner boxes were adequate to enclose the fish. He also placed the box in the freezer for a week and found that the box adequately survived that test and approved it. Moreover, Tucillo testified that he did not receive 63 sample boxes so that he could set up and test a whole pallet. According to Tucillo, he relied upon Economy to provide him with a shipping box that would survive the shipping process described above by Economy.

85.    Thus, because the testing that would have excluded the implied warranty of fitnes for a particular purpose was not feasible, the exclusion provided for in § 2-316 does not come into play.

Fitness for a Particular Purpose

86.    To prove a breach of an implied warranty of fitness for particular purpose, a plaintiff must show (1) a sale of goods, (2) that the seller had reason to know of any particular purpose for which the goods are required, (3) that plaintiff, as buyer of the goods, was relying upon seller's skills or judgment to select suitable goods, and (4) that the goods were not fit for the particular purpose for which they were used. *Maldonado v. Creative Woodworking Concepts*, 796 N.E.2d 662, 666 (Ill. App. Ct. 2003)

87.     Illinois "courts have found that a cause of action for breach of an implied warranty requires only a showing that the goods are unmerchantable or unfit for their intended purpose, regardless of whether they contain a 'defect.'" *Id.* (citation omitted). Moreover, "[s]ince the only issue governing liability in an implied warranty action is whether the product meets the required standard of merchantability or fitness, it is not relevant that the seller did or did not follow particular plans or specifications." *Id.*

88.     In this case, Tucillo, whose testimony the court credited, testified that he told Green that the outer boxes would be packed with the six inner boxes, palletized and then shipped to the distributors. Moreover, Tucillo testified that he relied on Green's skill and knowledge in providing him with a shipping box that could be frozen and withstand shipping. Finally, the boxes were not fit for the particular purpose for which they were used because they fell apart. Accordingly, Anchor has met its burden of demonstrating a breach of the implied warranty of fitness for a particular purpose. As such, Anchor had a basis to revoke its acceptance of the boxes. *Lathrop v. Tyrell*, 471 N.E.2d 1049, 1051 (Ill. App. Ct. 1984)("Breach of an implied warranty of fitness for a particular purpose gives rise to a right to revoke acceptance under the provisions of Section 2-608 of the Code.").

89.     The next question the court need address then, is whether Anchor properly revoked acceptance.

### Elements of Revocation of Acceptance

90.     "In order to be entitled to revoke acceptance of goods, a buyer must show the following: (1) a nonconformity in the goods that substantially impairs the value of the goods to the buyer, (2) acceptance was made on the reasonable assumption that the defect would be cured or because the acceptance was made without knowledge of the defect due to either the difficulty of discovering the defect or the seller's assurances, (3) revocation was made within a reasonable time after the nonconformity was or should have been discovered, (4) revocation occurred before a substantial change in the goods took place not caused by their own defects, and (5) the buyer gave the seller due notification." 810 ILCS 5/2-608 (West 1996).

91.     A buyer who chooses to revoke acceptance of goods has the same duties as if the buyer had rejected the goods. 810 ILCS 5/2-608(3). Thus, notice of revocation must be given within a reasonable time after the buyer discovers or should have discovered any breach or the buyer is barred from any remedy with regard to that breach. See 810 ILCS 5/2-607(3)(a).

92.     "The issue of the validity of an attempted revocation of acceptance in most instances hinges upon material questions of fact." *Sorce v. Naperville Jeep Eagle,*

*Inc.*, 722 N.E.2d 227, 232 (Ill. App. Ct. 1999)(citation omitted). Here, Economy challenges whether the non-conforming nature of the goods substantially impaired their value and whether the revocation was timely (which includes a determination of whether the defect was difficult to discover as asserted by Anchor).

### Substantial Impairment

93.  "Whether the value of the product has been impaired is determined subjectively, from the buyer's perspective." *North American Lighting, Inc. v. Hopkins Mfg. Corp.*, 37 F.3d 1253, 1258 (7th Cir. 1994)(citations omitted). "Whether such impairment is 'substantial,' however, is determined based on the objective evidence." *Id.* (citation omitted). "Once a person's faith is shaken in a major investment, the item not only loses its real value in the buyer's eyes, but also becomes an article whose integrity has been substantially impaired and whose operation is fraught with apprehension." *Lathrop v. Tyrrell*, 471 N.E.2d 1049, 1051 (Ill. App. Ct. 1984)(citation omitted).

94.  The evidence demonstrates that the value of his seafood products was (objectively and subjectively) impaired by virtue of the fact that at least two of Anchor's customers called to complain about the durability of the boxes and asked Tucillo not to ship product in boxes provided by Economy.

95.  Specifically, Tucillo testified that, at the request of two of his brokers, Colorado Choice and American Gold Label, he sent out pallets of the frozen boxes filled with seafood to various cold storage centers around the country. Approximately two weeks or so after sending out those shipments, Tucillo received a call from Colorado Choice telling Tucillo that the boxes were "splitting open" and were "crushed" when they came out of cold storage. Colorado Choice told him not to send those boxes anymore.

96.  Tucillo subsequently received a call (and letter) from another broker, American Gold Label, also complaining that the boxes were not holding up and that its customers did not want product delivered unless the boxes were "sturdier." The evidence demonstrates that the value of the boxes was substantially impaired in that Tucillo's customers were indicating that they would not accept future deliveries packed in the allegedly defective boxes.

### Timeliness of revocation/Latent defect

97.  Anchor received the first shipment of boxes from Economy on or about April 21, 2004. Anchor then sent out a shipment of frozen seafood, in the boxes provided by Economy, to Colorado Choice within approximately a week and a half, which would have been the first week in May. Then, approximately two weeks later, in

the third week of May, Tucillo received the first complaint from Colorado Choice.

98. On May 27, 2004, after having received the complaint from Colorado Choice, Tucillo sent Economy a "notice of rejection" by certified mail. On June 8, 2004, Tucillo received a letter of complaint from a second customer, American Gold Label.

99. Section 1-204(2) of the UCC provides that "reasonable time" for revocation depends on the nature, purpose and circumstances of the transaction. 810 ILCS 5/1-204(2).

100. Economy appears to claim that the time for revocation was not reasonable and cites *DiDomenico Packaging Corp. v. Nails Again*, 527 N.Y.S.2d 676 (N.Y. Civ. Ct. 1988). However, Economy's reliance on *DiDomenico*'s is misplaced. In *DiDomenico*, the defendant ordered cartons from the plaintiff which the court found were "clearly nonconforming." *Id.* at 677. Specifically, the boxes did not contain a customer guarantee that had previously been printed on earlier shipments. The court, however, addressed whether the goods had been accepted, not whether proper and timely revocation had been provided. Moreover, the *DiDomenico* court noted that the defects in the cartons at issue in that case was (or should have been) immediately apparent upon inspection.

101. According to Anchor, however, the alleged defect, i.e., the inability of the boxes to sustain a stacked load, could not have been discovered by a simple inspection at the time it took delivery of the boxes in late April 2004. "[T]he reasonable time for revocation of acceptance may be extended if the defect is difficult to discover or if the seller gives continuous assurances." *GNP Commodities, Inc. v. Walsh Heffernan Co.*, 420 N.E. 2d 659, 666 (Ill. App. Ct. 1981)("Contrary to defendants' position that revocation must take place immediately upon purchase, the case law supports the view that depending on the circumstances several weeks or months may elapse before revocation of acceptance.").

102. The court finds *S.M. Wilson & Co. v. Reeves Red-E-Mix Concrete, Inc*. 350 N.E.2d 321 (Ill. App. Ct. 1976), to be instructive. In *S.M. Wilson*, the defendant sold concrete mix to the plaintiff-builder to be used in a new construction building. The plaintiff initially examined the concrete mix and approved its use. However, several months later, the plaintiff discovered that the concrete was peeling and thus had samples tested for compressive strength. Most of the samples averaged a lower compressive strength than what the plaintiff had specified.

103. Although not specifically stated in *S.M. Wilson*, it appears that the plaintiff notified the defendant of the defective concrete several months after it was delivered. The court addressed whether the plaintiff had timely notified the seller of the breach under 5/2-714 (now incorporated in 5/2-607) such that it retained its right to seek a

remedy for the breach. The court concluded that "the defect complained of here was lack of compressive strength which would not be discovered, even in the cylinder tests, until the concrete hardened up to twenty-eight days later. . . .[The court] believe[s] that because of the nature of the goods involved plaintiff was not lax in the discovery of the defect and defendant was not prejudiced by the delay." *Id*. at 325. *See also* 14 Williston on Contracts § 40:27 (4th ed.) ("In essence, then, unless the defect is reasonably apparent or the buyer has some special expertise, a buyer who has made a reasonable inspection of goods and fails to find the defect has satisfied the 'difficulty of discovery' test for revoking acceptance.")

104. Similarly, in the instant case, whether the boxes held up during shipping is the type of problem that could not have been discovered until the boxes were shipped.

105. As soon as Anchor learned that the boxes were not holding up during shipment, it notified Economy of its "rejection" (which this court is interpreting as a revocation). Thus, the court finds that the revocation was timely made and that acceptance of the goods was made without knowledge of the defect due to the difficulty in discovering the defect.

*Failure to reject the inner cartons which were conforming*

106. Economy also asserts in its reply brief that Anchor could not reject the entire lot; rather, Economy contends that under 810 ILCS 5/2-601, Anchor could only reject the outer cartons, which were the non-conforming portion of the shipment, and had to accept the inner cartons.

107. As an initial matter, the court notes that Economy "accepted" the entire lot of goods under the UCC but then effectuated a proper revocation of that acceptance. Thus, given that 810 ILCS 5/2-601 section addresses "acceptance" and "rejection," it is not relevant to the instant situation.

108. In any event, it is inapplicable because this section offers a buyer a choice. Specifically, 810 ILCS 5/2-601 states that:

> Subject to the provisions of this Article on breach in installment contracts (Section 2-612) and unless otherwise agreed under the sections on contractual limitations of remedy (Sections 2-718 and 2-719), if the goods or the tender of delivery fail in any respect to conform to the contract, the buyer may:
> (a) reject the whole; or
> (b) accept the whole; or
> (c) accept any commercial unit or units and reject the rest.

109. Even assuming that "rejection" of goods is relevant to the instant situation,

Economy's citation to *Perkins Pipe & Steel Co. v. Acme Valve and Fitting Co.*, 276 N.E.2d 355 (Ill. App. Ct. 1971), inaccurately portrays the requirements of this section of the statute. *In Perkins*, the defendant refused to pay for part of a shipment of metal fittings, valves and flanges after it determined that the flanges were cast iron and not steel as ordered. The court found that the defendant "had the right to accept the four units of valves which conformed to the contract and reject the non-conforming flanges in issue." *Id.* at 356 (citing to Ill. Rev. Stat., ch. 26, par. 2-601, the predecessor of 810 ILCS 5/2-601). The court concluded that the defendant's rejection was made within a reasonable time and the plaintiff was seasonably notified, and therefore, "since defendant rightfully rejected the goods in issue, plaintiff is not entitled to payment for them." *Id*. at 356-57. Somehow, Economy takes from this that "[t]his case shows that a buyer *must* accept the portion of the goods that are conforming." Economy's Trial Memorandum at 13 (emphasis added).

110.    To the contrary, the relevant statute states that the buyer has the choice of three options. In *Perkins*, the buyer chose to accept part of the shipment, but in the instant case (again, assuming that rejection is even applicable) Anchor chose to reject the whole, which is permitted under the statute. Thus, Economy's reliance on this section is misplaced.

111.    Finally, the court notes that pursuant to U.C.C. Comment 7 to § 810 ILCS 5/2-608, "the buyer may revoke his acceptance, in appropriate cases, as to the entire lot or any commercial unit thereof." Thus, Anchor had the right to revoke acceptance to the entire lot.

        *Failure to allow time to cure*

112.    Economy also asserts in its proposed conclusions of law (but wholly fails to address in its post-trial briefs) that it should have been provided an opportunity to cure prior to Anchor revoking acceptance.

113.    The statute does not specify that the seller has a right to cure prior to a proper revocation. It does not appear that Illinois courts have addressed this specific issue. One Illinois court has stated that the seller must be allowed the opportunity to cure when revocation is based upon a seller's assurances. *Belfour v. Schaumburg*, 713 N.E.2d 1233, 1238 (Ill. App. Ct. 1999)(citing 810 ILCS 5/2-608(1)(a) and stating that the "the buyer must allow the seller time to cure before invoking revocation of acceptance"). However, this court has not found (nor did Economy cite) any authority in Illinois as to whether an obligation to allow the seller to cure exists when the buyer revokes on the basis that the defect was difficult to discover.

114.    While some courts have held that such a right to cure is either implicit in the language of the revocation provision or furthers the purpose of mitigating damages, others have rejected such a right.  As noted by a leading treatise:

> [W]here the buyer is seeking to revoke acceptance after accepting the goods without knowing that they were nonconforming and without, therefore, "expecting" the seller to cure the defects, and subsequently discovers that the goods are, indeed, nonconforming, the courts are divided on the question whether the seller has a right to cure before the buyer may revoke acceptance. . . . [T]he courts in the majority of jurisdictions have concluded that the seller's right to cure does not apply to situations in which the buyer revokes acceptance based on a subsequently discovered defect. . . .

> 18 Williston on Contracts § 52:25 (4th ed.).

115.    Given the lack of cases in Illinois on point, the court finds the reasoning cited in Williston to be persuasive and concludes that Illinois courts would find that a right to cure does not exist when the revocation is based on a subsequently discovered defect.  Accordingly, the court finds that Anchor's failure to allow an opportunity for Economy to cure prior to notice of revocation did not undermine its right to revoke.

### *Buyer's Remedies*

116.    Upon finding that Anchor had a right to revoke and properly did so, the court considers the remedies available to Anchor.

117.    Under 810 ILCS 5/2-711:

> (1) Where the seller fails to make delivery or repudiates or the buyer rightfully rejects or justifiably revokes acceptance then with respect to any goods involved, and with respect to the whole if the breach goes to the whole contract (Section 2-612), *the buyer may cancel* . . . .

118.    Under this section, because Anchor properly revoked, it had the right to cancel the contract.

## IV.    Conclusion

For the reasons stated herein, the court finds that Anchor has proven its affirmative

defense of breach of an implied warranty of fitness for a particular purpose, had a right to revoke

its acceptance of the boxes at issue and properly did so. As such, Anchor had a right to cancel the contract. Judgment thus is entered in Anchor's favor. The clerk is directed to enter a Rule 58 judgment to this effect and to terminate this case from the court's docket.


**Date:   March 19, 2007**

**Blanche M. Manning**
**United States District Judge**